**UNITED STATES of America**

v.

**Nicholas J. CICCO, Appellant in No. 92–5514,**

**Vincent Tabbachino, Appellant in No. 92–5515.**

**Nos. 92–5514, 92–5515.**

United States Court of Appeals, Third Circuit.

Argued March 16, 1993.

Decided Nov. 26, 1993.

Rehearing Denied Jan. 24, 1994.

Edna Ball Axelrod (argued), Michael Chertoff, Office of the U.S. Atty., Newark, NJ, for appellee.

John J. Bruno, Jr. (argued), Bruno & Ferraro, Rutherford, NJ, for appellant Cicco.

Anthony Kress (argued), Hackensack, NJ, for appellant Tabbachino.

Before: STAPLETON, ROTH and LEWIS, Circuit Judges.

## OPINION OF THE COURT

ROTH, Circuit Judge.

The defendants appeal their criminal convictions on two misdemeanor counts of violation of 18 U.S.C. § 601. Nicholas J. Cicco, the Mayor of Guttenberg, New Jersey, and Vincent Tabbachino, a town council member, were convicted of violating that statute by attempting to coerce municipal employees into performing services for the Democratic party as a condition of employment. Each defendant was sentenced to two months' house confinement and one year probation. The defendants challenge the convictions on two grounds. First, they contend that 18 U.S.C. § 601 is unconstitutionally vague and overbroad. Second, they claim that the evidence adduced at trial was insufficient to support their convictions. Because we conclude that there was insufficient evidence to support their convictions, we will reverse the district court's judgment of conviction. For this reason, we do not need to go on to the question of whether the statute is unconstitutionally vague and/or overbroad.

### I.

Defendants were originally indicted in May 1989 on multiple counts, including the § 601 violations and also charges of the corrupt solicitation of political services to influence the distribution of municipal jobs, in violation of 18 U.S.C. § 666(a)(1)(B). A jury trial was held in the fall of 1989. The district court dismissed various of the counts and submitted two of the § 666 counts, three of the § 601 counts, and a mail fraud count to the jury. The jury acquitted both defendants on the mail fraud count and acquitted defendant Cicco on one of the § 666 counts. Both defendants were convicted on two felony counts of violation of § 666. Cicco was convicted on three counts of violation of § 601, and Tabbachino was convicted on two § 601 counts. The district court then granted judgments of acquittal on the two § 666 counts and on one of the § 601 counts against Cicco. The government appealed the post-verdict judgments of acquittal on the § 666 counts.

In *United States v. Cicco*, 938 F.2d 441 (3d Cir.1991) ("Cicco I"), we reviewed the § 666 charges and concluded that Cicco and Tabbachino did not violate that section. We determined that Congress did not intend § 666 to cover actions plainly prohibited by § 601. However, because an order of acquittal is appropriate only where the evidence is insufficient to sustain the conviction, not where a statutory violation was inappropriately charged, we vacated the order of acquittal and remanded the case to the district court to enter an order dismissing the two § 666

counts. After the remand, the defendants were sentenced on the remaining § 601 counts. They have taken a timely appeal from their judgment of conviction on these counts.

In the § 601 counts under which Mayor Cicco and Councilman Tabbachino were convicted, the government charged them with corruptly soliciting political services and loyalty from Michael Postorino and Francisco Marrero in exchange for municipal jobs as Special Police Officers ("Specials"). Specials are part-time municipal employees, appointed by the town pursuant to New Jersey law, who assist the police department and regular officers in the discharge of their duties. They are assigned work for any amount of time up to a maximum of 20 hours per week. The town council appoints Specials to one-year terms and the police department assigns shifts weekly. There is no legal requirement that the town reappoint Specials; customarily, though, regular police officers are appointed from the ranks of Specials.

In Guttenberg, Democratic candidates traditionally face little opposition in general elections. In the 1988 election, however, the Republican candidate, Andy Juncosa, mounted a strong but ultimately unsuccessful challenge for a seat on the town council. Postorino and Marrero were Specials in Guttenberg during 1988. It was widely known that both men were friendly with Juncosa. Neither Postorino nor Marrero actively participated in the November 1988 election. On the eve of the election, Postorino had a heated argument with Joe Sherry, a Democratic campaign worker, during which Postorino allegedly threatened to assault Sherry. Shortly after the election, Postorino and Marrero were dropped from the Specials' work schedule. When Postorino and Marrero asked why they had been dropped, police department officials told them that no work was available until they spoke with Mayor Cicco.

Marrero spoke to the mayor in late November of 1988. Cicco explained that members of the town council were upset with Marrero because he had not actively supported the town's Democratic organization in the recent election. More specifically, he had not hung signs, solicited votes or attended organizational meetings. Cicco told Marrero that, as a result of the displeasure of certain town council members, Marrero could not work as a Special. After Marrero protested, Cicco suggested that Marrero give Cicco an opportunity to discuss the matter with the town council. Postorino came to understand that he was being denied work for the same reason.

Postorino and Marrero then conferred with their friend (and former Republican candidate) Juncosa. Juncosa arranged a meeting with the Hudson County, New Jersey, Prosecutor's office. As a result of that meeting, Postorino and Marrero agreed to secretly tape their conversations with Cicco and Tabbachino. Postorino met with both Cicco and Tabbachino; Marrero only met with Cicco. The transcripts of those conversations indicate that the defendants gave the following reasons for not having assigned work to Marrero and Postorino: municipal cutbacks, their lack of active support in the November election, and reports that Postorino had threatened a Democratic campaign worker (Joe Sherry). In January 1989, neither Postorino nor Marrero was reappointed as Specials.

Extensive portions of the taped conversations supplied the principal evidence introduced at trial.[1] As we note above, the jury returned guilty verdicts on five counts. The district court then granted judgment of acquittal on three of these. After the resolution of *Cicco I* and the dismissal of the § 666 counts, the defendants were each sentenced on the remaining counts of conviction to one year probation with two months of home confinement. They timely appealed; we will consider their appeals together. The United States District Court for the District of New Jersey had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

To evaluate the sufficiency of evidence to support a criminal conviction, we must examine the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), to determine if any reasonably minded jury "could have found

---

1. The County Prosecutor decided not to prosecute on the basis of the tapes; however, the U.S. Attorney elected to bring a 12–count indictment against Cicco and Tabbachino.

the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *see United States v. Brown*, 3 F.3d 673, 680 (3d Cir.1993). We must sustain the jury verdict if there is substantial evidence to support it. *Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *United States v. Aguilar*, 843 F.2d 155, 157 (3d Cir.1988).

## II.

The question raised by this appeal, the proper interpretation of 18 U.S.C. § 601, appears to be a question of first impression. Neither of the parties involved has cited nor have we independently discovered any reported decisions involving the statute.[2] The relevant part of § 601 provides:

> Whoever, directly or indirectly, knowingly causes or attempts to cause any person to make a contribution of a thing of value (including services) for the benefit of any candidate or any political party, by means of the denial or deprivation, or the threat of denial or deprivation, of—
>
> (1) any employment, position, or work in or for any ... political subdivision of any State ...
>
> if such employment, position, work, compensation, payment, or benefit is provided for or made possible in whole or in part by an Act of Congress [shall be guilty of a crime].

18 U.S.C. § 601(a) (1988).

In arguing that the evidence was insufficient to support their convictions, the defendants point to three essential elements of § 601: (1) a knowing causation of or attempt to cause a contribution to a candidate or political party; (2) a denial or deprivation of employment in an entity of a political subdivision of a State; and (3) funding of the employment by Congress. They contend that sufficient evidence to satisfy the first element, the "extortionate political kickback practice," is totally lacking from the taped conversations.[3] The defendants assert that there is ample evidence to suggest that Postorino and Marrero were denied employment because they failed to support the Democratic candidates in the November 1988 election. However, they argue that this constitutes no more than evidence of retaliation and that retaliation is not punishable under the language of § 601.

The government does not base the violation of § 601 on a retaliatory dismissal. To the contrary, it contends that the evidence is sufficient to support a jury verdict based upon the allegation that Cicco and Tabbachino attempted to coerce Marrero and Postorino into providing future political services in exchange for employment as Specials. The government rejects the defendants' "retaliation" theory of the case and argues that Cicco and Tabbachino held out the prospect of further employment if Postorino and Marrero would contribute their campaign services in the future.

We will utilize the traditional tools of statutory construction in order to determine what conduct constitutes a violation of § 601. Thereafter, we will analyze whether there is sufficient evidence to demonstrate that Cicco's and Tabbachino's conduct did violate the statute.

The legislative history of § 601 indicates that Congress enacted it primarily to criminalize employers' exercise of the "lug" method of financing political parties. *See* S.Rep. 94–1245, 94th Cong.2d Sess., *reprinted in* 1976 U.S.C.C.A.N. 2883–84. Under the "lug" system, non-civil service public employees would be assessed a percentage of their salary by the political party to which the worker

---

**2.** In *Cicco I*, in commenting on the scope of 18 U.S.C. § 666, we also discussed § 601. We stated that, because "section 601 is a criminal statute that clearly does cover the activities alleged in this case[,]" it was unlikely that Congress intended that the activities were also encompassed by § 666. 938 F.2d at 446. We did not, however, discuss § 601 substantively; nor did we consider the sufficiency of the evidence on the § 601 counts.

**3.** Defendant Cicco concedes the existence of elements (2) and (3); however, Tabbachino additionally contests the sufficiency of the evidence of Congressional funding for Postorino and Marrero's employment. Because of our conclusion that there was insufficient evidence to support the existence of the first element, we will not go on to consider element (3).

owed his position.[4] 18 U.S.C. § 601 is "designed and intended to protect public servants, prospective public servants and certain other beneficiaries of government programs from *extortionate* political kickback practices." 1976 U.S.C.C.A.N. at 2884 (emphasis added).

Tabbachino argues that in order to avoid any "constitutional problems," we should restrict the scope of section 601 to criminalizing the "lug." We disagree and discern a Congressional intent against such a limited construction. While the specific problem that Congress was addressing was financial demands on public servants, neither the language of section 601 nor the legislative history suggests that the court should distinguish between demands for money and demands for services that have no identifiable market value, or which have value only to the person(s) seeking the contribution. Section 601's parenthetical language "(including services)" clearly indicates to us that Congress intended to reach non-monetary contributions. The district court reached the same conclusion.

■ "In determining the scope of a statute, we look first to its language. If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'" *Russello v. United States*, 464 U.S. 16, 20, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983). We therefore agree with the district court's conclusion that section 601's language "thing[s] of value (including services)" includes services without an apparent market value and services of value only to the person(s) seeking the contribution (such as hanging signs, soliciting votes or attending meetings).

The original language of section 601 punished an employer who deprived employment or other benefit "on account of [an employee's] refusing to make a political contribution." In a letter expressing its support for the legislation, the Department of Justice suggested amending the language "on account of refusing to make a political contribution" to avoid the interpretation that section 601 applied *only if* the employee refused to make the contribution. *See* 1976 U.S.C.C.A.N. at 2885–86. The Justice Department offered to work with Congress on the revision. Apparently, section 601's present language—"attempts to cause" any person to make a contribution of a thing of value (including services)—is the product of that collaborative rewrite. The Justice Department proposed the amended language in order to simplify section 601(a), to remove ambiguity with respect to the scope of the offense, and to make it clear that completion of the crime is not conditioned upon the victim's refusal to comply with the *extortionate demand* for payment. 1976 U.S.C.C.A.N. at 2885 (emphasis added).

■ When Congress included the word "attempt" in section 601, it used a common law term. Generally, where Congress uses a common law term in a federal criminal statute, absent a new instruction defining it, Congress is presumed to adopt the term's widely accepted common law meaning. *Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 249, 96 L.Ed. 288 (1952); *United States v. Nedley*, 255 F.2d 350, 357 (3d Cir. 1958). Section 601 does not contain a separate provision defining the word attempt; therefore, we resort to its common law definition.

The offense of attempt "consists primarily in the intention with which the preparations were made." *United States v. Quincy*, 31 U.S. (6 Pet.) 445, 466, 8 L.Ed. 458 (1832); *see United States v. Bailey*, 444 U.S. 394, 405, 100 S.Ct. 624, 632, 62 L.Ed.2d 575 (1980). Intent, however, is not "the sole criterion to be considered in determining criminal responsibility," *United States v. Berrigan*, 482 F.2d 171, 188 (3d Cir.1973), because of the difficulties of proof. "To prevent mistaken convictions the government must introduce some measure of objective evidence corroborating the attempt[ ]...." *United States v. Everett*, 700 F.2d 900, 908 (3d Cir.1983). "[T]he crime of attempt [should] not be used to 'punish one's thoughts, desires, or motives, through indirect evidence, without reference to any objective fact.'" *Id.* at 908–09 (quoting *United States v. Oviedo*, 525 F.2d 881,

---

4. The legislative history contains an example of the "lug" from Indiana, where each employee was required to contribute 2% of his salary to the state party, and an additional 1% to the local party in some areas. 1976 U.S.C.C.A.N. at 2884.

884 (5th Cir.1976) (citing *Berrigan*, 482 F.2d at 189 n. 39)). That objective fact must be demonstrated at trial by evidence of conduct constituting a substantial step toward commission of the crime in pursuit of the culpable intent. *See, e.g., United States v. Buffington*, 815 F.2d 1292, 1301 (9th Cir.1987) (a substantial step is conduct that is strongly corroborative of the firmness of a defendant's criminal intent).

We find that the legislative history and purpose of the statute indicate that a necessary element of the crime proscribed in § 601 is an employer's demand for political patronage from an employee in order to either retain or obtain government sponsored employment. The demand may be either direct or indirect, as § 601's language provides. However, an employer's mere expectation or desire that the employee contribute services for the political benefit of the employer is not sufficient. There must be evidence of actual campaign contributions or services "caused" by threats of terminating employment, or evidence of an employer's "attempt to cause" a contribution of future campaign contributions or services corroborated by an objective fact, such as evidence of employment offered or obtained.

Since it is uncontested that Postorino and Marrero did not contribute services to the Democratic party in the November 1988 election, they fall under the second scenario. Under this scenario, objective evidence that Postorino and Marrero were actually reappointed, or offered reappointment, as Specials would tend to corroborate the charge that Cicco and Tabbachino "attempted to cause" them to make campaign contributions. Our review of the record, however, does not demonstrate evidence of any offer, implicit or explicit, to either Postorino or Marrero of reinstatement as Specials or of any other future employment by the town. Nor does our review uncover any request, direct or indirect, that future political services be contributed by them.

As we previously noted, both sides point to various portions of the three taped conversations to promote their theories. Cicco and Tabbachino proposed several reasons why Postorino and Marrero were denied work, including: the budget cuts, the Joe Sherry incident, and (mainly) the lack of contribution of campaign services. The defendants argue that the taped conversations illustrate that the denial of employment was solely in retaliation for Postorino's and Marrero's past refusal to lend political support on election day. By contrast, the government avers that the taped conversations reveal the defendants' "attempts to cause" Postorino and Marrero to contribute political services in the future by promising to reappoint them as Specials or regular police officers.

We do not deny that the facts of this case present a close call on this question. The district judge agreed. His comments at trial, in response to the defenses' motions for judgments of acquittal and for a new trial, indicate the judge's uncertainty and concern about the sufficiency of the evidence:

THE GOV'T: The tapes are full of them holding out the possibility ... for redemption or for making amends, or putting themselves back in the proper position. All they have to do is show the loyalty and perform the services.

THE COURT: What services?

THE GOV'T: I think it is to show up at meetings, I think it is to be available in the future. I think there has been testimony in this case that there are meetings, and people actually just worked at the meetings, whether it is serving food or cleaning the place up.

THE DEFENSE: There was no such testimony.

THE GOV'T: Your Honor, there is also Mr. Cicco himself saying, you don't hang signs, you didn't come out, you didn't work. It is not just showing up at meetings which is part of it, but it is also all of these things.

You have got to come out and work and I think the key element here is work and that is the services that they were demanding. Political officials don't function without having people working for them, supporting them and there are two ways to get it obviously in Guttenberg.

One way is to have people just come in and volunteer and the other way is to force them in. You want something from this town and from the people that are in power, Mr. Cicco says, I am in. Judge, there is only one reading for that, I am the person who is controlling the

appointments here. I am in. You don't come out and support me, you are not going to get supported when it comes to appoint town jobs.

THE COURT: Are you saying there is evidence to support the following scenario?

In the conversations between either defendant and Postorino and Marrero, that in the past you have not done what we expected of you, therefore, you are not going to work again as Specials. Or indeed that you won't be appointed regulars. However, if in the future, you do what is expected of you, and, that is prescribed on the tapes.

   \*    \*    \*    \*    \*    \*

Do what is expected of you in the future, then there is a possibility of redemption.

THE GOV'T: Yes, Judge. Now—

THE COURT: There is evidence to support that?

THE GOV'T: They never come out and say, if you come out and support us in the future, you have a chance for redemption.

THE COURT: We all know the evidence isn't coming out and saying it, what circumstantial evidence and what inferences.

THE GOV'T: I think the tapes are replete, especially Mr. Tabbachino's listing of the people who had come out, and I have to respect them and you know, people are going to get promoted who don't deserve it, but they came out and supported us. The lecture is there, Judge. This is what you have to do and this is how you will get appointed in the future.

There is no reason to explain to them what these other people have done and why they are going to get promoted if they aren't holding out that carrot, that future possibility, that you can come back and do it. We will get this all cleared up, we will sit down and talk. I would like to see you get the job, Mr.

Tabbachino says, as opposed to the work which is the, the work as a Special. JA at 255–57.

The district court concluded that there was sufficient evidence from which a rational jury could find that Cicco and Tabbachino attempted to cause Postorino and Marrero to contribute political services to the Democratic party. We disagree. An illegal "attempt to cause" a contribution of campaign services under § 601 requires a demand for services and a continuation of present employment or an offer of future employment in return for those services. The weakness of the government's position lies in the fact that, after the November 1988 election, neither Marrero nor Postorino was offered employment either with the Special Police or with any other Township agency or department. There is no evidence in the record to support that any such offer was made, either directly or indirectly.

The comments by the Mayor and Tabbachino, "we would like you working with us," conveys a desire but not a demand. Neither the mayor nor the councilman nor any member of the Council or of the Township government ever went on to make an offer of employment to or a demand for services from Marrero or Postorino. Under the provisions of § 601, we do not punish the desire to extract political services if in fact the attempt to extract such services in the future is not made through a threat to terminate present employment or as a condition of future employment.

Furthermore, neither Cicco nor Tabbachino ever asked for particular services in the future. The additional fact that Postorino and Marrero were not reappointed as Specials undermines the likelihood that a rational jury could find that Cicco and Tabbachino implicitly asked for campaign services in return for reinstating them. To the contrary, the evidence indicates that defendants' primary motivation in removing Marrero and Postorino from the Specials list was in retaliation for their past failure to help out in the November 1988 election campaign.[5]

Under these circumstances, it is more rationally inferred from the taped conversations that Postorino and Marrero were told to see the Mayor and Tabbachino in order to

---

5. We are not, of course, dealing here with the issue of what remedy, if any, would be available to a township employee, who had been dismissed

for failure to contribute past political services and who had a legally protected interest in his job.

learn the reason why they could no longer work as Specials rather than as a condition of returning to work. On the tapes, the Mayor and Tabbachino explained what those who had worked for the party in the November election had received. The Mayor and Tabbachino stated that, if Postorino and Marrero had worked for the party during the election, they, too, would have received a benefit. But the election was now over. The Mayor and Tabbachino made no references to any future political services for which either Postorino or Marrero could volunteer in order to gain back his job as a Special. Nor do Postorino or Marrero inquire whether employment would be offered again if their services were volunteered for political activities. For the foregoing reasons, we conclude that there is insufficient evidence of Cicco's and Tabbachino's attempt to violate § 601.

### III.

Because we find that there is insufficient evidence for a rational jury to conclude that the defendants attempted to violated the statute, we will reverse the district court's judgment of conviction.