UNITED STATES of America

v.

Kai-Lo HSU a/k/a James
Hsu Chester Ho.

Criminal Action Nos. 97–323,
97–323–01 and 97–323–02.

United States District Court,
E.D. Pennsylvania.

Oct. 27, 1997.

Richard Goldberg, Asst. U.S. Atty., Philadelphia, PA, for the Government.

Norman Greenspan, Blank, Rome, Comisky & McCauley, Philadelphia, PA, Stephen LaCheen, Philadelphia, PA, for Kai–Lo Hsu.

Thomas Suddath, Montgomery, McCracken, Walker & Rhoads, LLP, Philadelphia, PA, William E. McDaniels, Williams & Connolly, Washington, DC, for Chester Ho.

## MEMORANDUM

DALZELL, District Judge.

A Government motion for a protective order prompts our inquiry here into difficult issues that the Economic Espionage Act of 1996 raise regarding the disclosure of allegedly confidential trade secrets to defendants in criminal prosecutions brought under that recent statute.[1]

*Introduction*

This case arises out of a two-year "sting" operation in which an undercover FBI agent, posing as "John Mano", allegedly offered to sell to the defendants the formulae and processes for the manufacture of an anti-cancer drug, Taxol ("Taxol technology"), which Bristol–Myers Squibb Company ("Bristol–Myers") manufactures. The sting operation

---

1. We note at the outset that the Government is entitled to an interlocutory appeal of this decision pursuant to 18 U.S.C. § 1835 ("An interlocutory appeal by the United States shall lie from a decision or order of a district court authorizing or directing the disclosure of any trade secret"). Inasmuch as this motion raises unsettled and important questions of law, we encourage the Government to seek further clarification of them from our Court of Appeals.

culminated in a June 14, 1997 meeting at which the defendants, Kai–Lo Hsu a/k/a James Hsu ("Hsu") and Chester Ho ("Ho"), were arrested.

The defendants are charged, *inter alia,* with violating the Economic Espionage Act of 1996, 18 U.S.C. § 1831–39 ("the EEA" or "the Act"). Specifically, the defendants are charged under 18 U.S.C. § 1832(a)(4),(5) with the inchoate offenses of attempted receipt/possession of a trade secret and conspiracy to receive/possess a trade secret, as well as with the completed offense of unauthorized conveyance of a trade secret under 18 U.S.C. § 1832(2). *See* Counts 10–11 of Indictment.

The Government now seeks a protective order pursuant to 18 U.S.C. § 1835[2] and Fed.R.Crim.P. 16(d)(1) to prevent the defendants from reviewing Bristol–Myers's Taxol technology documents because the Government contends that many of the documents contain confidential trade secrets. See Government's Motion, p. 1. While recognizing their duties to disclose information to the defendants under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and Fed.R.Crim.P. 16(a), the Government proposes that we enter a protective order whereby all of the requested documents would be reviewed *in camera,* with redactions made to those documents that we determine contain confidential trade secrets. See Government's Motion, p. 1–4.

In response, the defendants propose a less restrictive protective order. Under the defendants' proposed protective order, we would restrict the disclosure of materials the Government designates as "confidential" only to those individuals—such as the defendants' attorneys, outside experts and prospective witnesses—who would need to use the documents solely for defense purposes. Furthermore, each person given access to the documents would be required to sign an agreement binding the individual to the terms of the Order. In addition, the defendants' proposed protective order provides

that any Bristol–Myers documents used throughout the case will be filed under seal or submitted to the Court for in camera inspection. Finally, defendants propose that we resolve any questions regarding the use of any of the confidential material at pretrial, trial, or post-trial hearings, with the documents being returned or destroyed when the case is over.

After extensive briefing, the Government has essentially raised four major arguments in support of its proposed protective order. First, the Government argues that it has a legitimate interest in protecting the integrity and confidentiality of trade secrets and business information. See Government's Motion p. 5–7. Second, it contends that in the absence of *in camera* review and redaction, the defendants will receive information that is irrelevant and immaterial to their defense. See Government's motion at p. 8–9. Third, the Government raises the specter of "graymail," which occurs when defendants press for the release of sensitive information and then threaten publicly to disclose the information in an attempt to force the Government to drop its charges. See Government's Motion p. 7–8. Fourth, the Government claims that the documents the undercover FBI agent brought to the June 14, 1997 meeting are immaterial because even if those documents had been blank or contained "dummy" formulas, the defendants still could have committed a crime. See Government's Reply Brief, p. 3. This fourth argument raises the distinction between the defense of legal impossibility and factual impossibility.

We will now address each of these arguments in turn.

### I. Legitimate Government Interest

The Government first argues that it has a legitimate interest in protecting the integrity and confidentiality of trade secrets and business information. See Government's Motion p. 5–7. In support of this position, the Government cites several cases, both civil and

---

**2.** 18 U.S.C. § 1835 provides in pertinent part that "[i]n any prosecution or other proceeding under this chapter, the court shall enter such orders and take such other action as may be necessary and appropriate to preserve the confi-

dentiality of trade secrets, consistent with the requirements of the Federal Rules of Criminal and Civil Procedure, the Federal Rules of Evidence, and all other applicable laws." 18 U.S.C. § 1835.

criminal, where courts determined that *in camera* review and redaction of documents was necessary to protect confidential business information. See *id.* Furthermore, the Government points to the language of the EEA itself to argue that the unnecessary disclosure of trade secrets is precisely the harm Congress sought to avoid when it adopted the Act. See Government's Motion, p. 8. In essence, the Government contends that it should not be required to turn over the very trade secrets that the defendants were allegedly trying to steal in the first place. *See* Government's Motion, p. 10.

■ We find that we cannot issue the Government's requested protective order because if we were to grant such relief we would effectively be relieving the Government of the burden of proving one of the essential elements of its case: the existence of a trade secret. It is well-settled that the Government must convince the trier of fact of all of the essential elements of guilt upon proof beyond a reasonable doubt. *See United States v. Gaudin,* 515 U.S. 506, 511, 115 S.Ct. 2310, 2314, 132 L.Ed.2d 444 (1995) ("The Constitution gives a criminal defendant the right to demand that a jury find him guilty of' all the elements of the crime with which he is charged."); *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").[3]

■ The defendants here are charged with theft and attempted theft of trade secrets. See 18 U.S.C. § 1832(a). The Government must prove under the plain language of the statute that a "trade secret" existed within the meaning of the Act. The statute states, in relevant part, that

> [w]hoever, with intent to convert a trade secret, that is related to or included in a product that is produced for or placed in interstate commerce or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or

knowing that the offense will, injure any owner of that trade secret ... [ (listing various methods) ] ... shall, except as provided in subsection(b), be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. § 1832(a). In addition, the statute defines "trade secret" as

> all forms and types of financial, business, scientific, technical, economic, or engineering information.. [where] (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public.

18 U.S.C. § 1839(3). The existence of a "trade secret" is, therefore, an essential element of the crime and thus is a question of fact which the defendants have the right to have a jury decide. *See Gaudin,* 515 U.S. at 510-24, 115 S.Ct. at 2314-20 (holding that materiality' was an essential element of the Government's case under 18 U.S.C. § 1001 and that the defendant had a constitutional right to have the jury, rather than a judge, decide).

In fact, the Government's own prosecution manual stresses that the existence of a "trade secret" is an essential element of the crime and a question of fact for the jury. In the Department of Justice's Manual entitled "Federal Prosecution of Violations of Intellectual Property Rights" (May 1997) ("the Manual"), the sample language for jury instructions regarding 18 U.S.C. § 1832 makes clear that the Government must prove as one of six elements of its case "that the information was in fact a trade secret." *See* Chester Ho's Response, Exhibit A. Furthermore, the Manual states that "the *sine qua non* of information constituting a trade secret is that it is not publicly known" and "[w]hether the information was secret before it was obtained by the defendant is a question of fact." See

---

**3.** As this is one of the first cases brought under 18 U.S.C. § 1832, *et seq.,* we note that most of the cases the Government cites are inapposite because they involve civil matters or because in none was the suppressed information an element of the crime charged.

Chester Ho's Response, Exhibit C, at internal p. 75.

We are also troubled by the reality that if we were to restrict the defendants' access to the Taxol technology documents by giving them redacted documents during discovery, we would interfere with their Sixth Amendment right to cross-examination at trial. *See Greene v. McElroy,* 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959) ("[T]he evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue."). Indeed, the very fact of redaction would connote to the jury that important trade secrets indeed lurked in these papers.

With the passage of 18 U.S.C. § 1832, which first criminalized the theft of trade secrets, and the passage of 18 U.S.C. § 1835, which encourages protective orders for prosecutions under the EEA, Congress has created an inherent tension between the statute and defendants' constitutional protections. On the one hand, if during discovery we deny to the defendants complete access to the Taxol technology, we inhibit their constitutional right to effective cross-examination as well as their right to have a jury, rather than a judge, determine whether a "trade secret" exists. On the other hand, if we grant the defendants complete access to the Taxol technology, we impair the very purpose of the EEA. When faced with such a choice, the Supreme Court long ago made clear what prevails: "if a law be in opposition to the constitution: if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law ... the constitution, and not such ordinary act, must govern." *Marbury v. Madison,* 1 Cranch 137, 5 U.S. 137, 178, 2 L.Ed. 60 (1803).

Therefore, while we recognize that the Taxol technology documents require some measure of protection, we cannot give them a perfect shield without violating the defendants' Due Process and jury rights under the Fifth and Sixth Amendments. See *Gaudin,* 515 U.S. at 508–10, 115 S.Ct. at 2313. Ac-

cordingly, we cannot adopt the Government's proposed protective order, but will instead adopt the protective order the defendants proposed.

## II. Relevance and Materiality

The Government also argues that, in the absence of *in camera* review, the defendants will receive information that is irrelevant and immaterial to their defense. See Government's motion at ¶ 8–9. In particular, the Government contends that the "precise ingredients, quantities and process information in the proprietary formulas, are irrelevant to any issue in the case" and should be redacted. *See id.* at p. 9.

Because the defendants must have the opportunity to build a defense that Taxol technology was not a "trade secret", they must have the exact processes and formulae for Taxol available to them—or at least those formulae and processes that the Government will contend to the jury are "trade secrets". We again turn to the Department of Justice's Manual on Intellectual Property prosecutions, which notes that in order to build a case that information is a trade secret "i.e., that the information was not generally available to the public ... prosecutors should make sure that the information had not been publicly disclosed through, for example, technical journals or other publications and should determine whether the information was obvious to the victim's competitors in the industry." *See Chester* Ho's Response, Exhibit C, at internal p. 75.

Assuming the Government here follows its Manual's scenario, the defendants must be given the correlative right to compare the information relating to Taxol production that is publicly available, *e.g.* in the form of patents and scientific literature, with whatever details of the Taxol technology that the Government will claim at trial is a confidential "trade secret". While we find it unnecessary to identify an absolute constitutional right to a level playing field in these cases, we do find that if the prosecution is able to use complete and accurate Taxol technology documents to measure for the jury the dimensions of the secret involved, the defendants should be given the means to rebut it.

Compare our analysis of these questions on the hypothesis that this case instead involved Coca–Cola's world-famous "secret formula". The Coca–Cola Company maintains that there is only one copy of the original recipe for Coke, locked in a vault at the Trust Company of Georgia, unavailable to anyone for any reason except by formal vote of the company's board of directors. *See* Frederick Allen, *Secret Formula: How Brilliant Marketing and Relentless Salesmanship Made Coca–Cola the Best-Known Product in the World* 17 (1994). Further, Coca–Cola points out that only two company officials are allowed to know the formula at any given time, and their identities would never be disclosed for any reason. See id. at 162.[4]

While we do not pass judgment on the validity of Coca–Cola's claims, we note that if such claims were true, then the actual formula for Coke would never need to be disclosed in litigation to prove that it was a trade secret because of the extreme measures the firm has taken for so long to protect it, and because of the lack of public knowledge about it.

By contrast, the defendants here have alleged, and the Government does not contest, that "a substantial amount of the information relating to Taxol production is publicly available through existing patents, scientific literature and other means." Defendant Chester Ho's Opposition, p. 4. Therefore, the defendants must be given access to the Taxol technology documents to compare them to the information that is already public.

Parenthetically, the formula for Coca–Cola is not sacrosanct, even in a civil case. See *Coca–Cola Bottling Co. of Shreveport, Inc. v. The Coca–Cola Co.,* 107 F.R.D. 288, 299 (D.Delaware 1985) (known to cognoscenti as *"Diet Coke III"*) (holding that the formulae for Coke, New Coke, and Diet Coke, while all trade secrets, should be disclosed to the plaintiff because they had met their burden of demonstrating a need for the formula greater than the company's need for protection of its secrets).

### III. "Graymail"

Third, the Government raises the specter of "graymail." See Government's Motion p. 7–8. "Graymail" occurs when defendants press for the release of sensitive information, and then threaten to disclose it to force the Government to drop its charges. See *United States v. Pappas,* 94 F.3d 795, 799 (2d Cir. 1996). The Government argues with much force that "[t]he unnecessary disclosure of trade secrets is a harm that the Economic Espionage Act of 1996 explicitly instructs the courts to guard against." See Government's Motion p. 8 (citing 18 U.S.C. § 1835). The Government can also be forgiven for not reposing much trust in defendants who it contends are linked to wrongdoers far removed from the borders of our contempt power.

It seems to us that the defendants' proposed protective order minimizes the danger of graymail because anyone violating the protective order will be subject to the Court's contempt power.[5] Such an order in our view comports with the EEA. While the plain language of § 1835 offers no suggestion of whether confidential information should ever be disclosed to the defendants to assist in the preparation of their defense, the legislative history of the Act is somewhat illuminating. The House Report describes the purpose of § 1835 as follows:

> The intent of this section is to preserve the confidential nature of the information and, hence, its value. Without such a provision, owners may be reluctant to cooperate in prosecutions for fear of further exposing their trade secrets *to public view,* thus

4. We now know from his obituary that the late Chief Executive Officer of Coca–Cola, Roberto C. Goizueta, was one of the two. See Jerry Schwartz, *Roberto C. Goizueta, Coca–Cola Chairman Noted for Company Turnaround. Dies at 65,* N.Y. Times, October 19, 1997, at section 1, p. 45. ("Mr. Goizueta was the only one of the six allowed to have 'the knowledge'—the formula for making Coca–Cola, one of the most closely guarded industrial secrets in the world. Only two people knew the formula and the company would not even disclose the identity of the second person.")

5. We again note that anyone gaining access to the Taxol technology documents under the defendants' proposed protective order must first sign an agreement binding them to the terms of the protective order.

further devaluing or even destroying their worth.

H.R. Rep. 104–788 at 13, *reprinted in* 1996 U.S.C.C.A.N. 4021, 4032 (emphasis added). Congress's overarching concern in § 1835 is thus with disclosure of confidential trade secrets to the "public", rather than to the parties involved in a criminal prosecution.

Accordingly, while not offering perfect protection in an imperfect—and highly competitive—world, the defendants' proposed order offers sufficient protection of the Taxol technology within the meaning of the Act because it limits disclosure only to the parties and only for purposes of forming their defense. The defendants' proposed protective order does not allow for any disclosure of the Taxol technology to the general public, and this affords the protection the Government (and doubtless Bristol–Myers) legitimately demands.

*IV. The June 14th Documents and the Impossibility Defense*

Finally, the Government argues that it should not be required to turn over the documents the undercover FBI agent brought to the June 14, 1997 meeting because they are immaterial to the defense. *See* Government's Reply Brief, p. 3. The Government argues that even if those documents had been blank or contained "dummy" formulas, the defendants still could have committed a criminal offense.

In response, the defendants raise the defense of legal impossibility. For the reasons set forth below, we reject the defendants' claims of legal impossibility as applied to the EEA, but find that the defendants are entitled to review the June 14th documents to the extent of their constitutional rights canvassed above.[6]

The defendants' argument raises the intricate distinction between the defenses of factual and legal impossibility. Factual impossibility exists when the objective of the actor is proscribed by the criminal law, but extraneous circumstances, unknown to the actor or beyond the actor's control, prevent him from completing the intended crime. *See United States v. Conway,* 507 F.2d 1047, 1050 (5th Cir.1975); *United States v. Berrigan,* 482 F.2d 171, 188 (3d Cir.1973). A classic example of factual impossibility posits a man who puts his hand in the coat pocket of another with the intent to steal his wallet but finds the pocket empty. *See Berrigan,* 482 F.2d at 188. Traditionally, factual impossibility is not a defense to the inchoate charge of attempt, *see id; see also United States v. Hamrick,* 43 F.3d 877, 885 (4th Cir.1995) (citing cases), or to the inchoate charge of conspiracy, *see United States v. Clemente,* 22 F.3d 477, 480–81 (2d Cir.1994); *United States v. Medina–Garcia,* 918 F.2d 4 (1st Cir.1990); *United States v. Bosch,* 914 F.2d 1239, 1244 (9th Cir.1990).

The defense of legal impossibility is available, however, "where the defendant's acts, even if fully carried out as intended, would not constitute a crime." See *Hamrick,* 43 F.3d at 885. An example of where the defense of legal impossibility might historically apply arose in *United States v. Duran,* 884 F.Supp. 577 (D.D.C.1995) (Richey, J.) (rejecting application of legal impossibility defense). In *Duran,* the defendant was charged with the attempted assassination of President Clinton in violation of 18 U.S.C. § 1751 after he fired a gun at the White House. The defendant had fired upon the White House after he saw a man, Mr. Dennis Brasso, who resembled Mr. Clinton, standing on the White House grounds. In his motion, Duran unsuccessfully argued that because Mr. Brasso is not the President of the United States or another official identified under 18 U.S.C. § 1751, the defendant could not have been prosecuted under that statute had he succeeded in killing Mr. Brasso and, therefore, he could not be charged with attempting to commit that crime. See id. at 579.

Similarly, the defendants here contend that for the Government to sustain its charge of attempted receipt/possession of a trade

---

6. Although we hold in this section that the Government has the better of the argument on this point, that reality does not outweigh or undermine our holding that the defendants are entitled to see what the Government regards as the details of the "trade secrets" at issue here.

secret under 18 U.S.C. § 1832(a)(4), it must prove that the actual documents presented to the defendants at the June 14, 1997 meeting ("June 14th documents") were indeed trade secrets within the meaning of the EEA. Absent such a finding, the defendants argue that under the logic of *United States v. Berrigan*, 482 F.2d 171 (3d Cir.1973), it would be legally impossible to convict the defendants of the crime of attempt because, "[s]imply stated, attempting to do that which is not a crime is not attempting to commit a crime." *Id.* at 190. Therefore, the defendants claim that it is "absolutely material to the defense that the defendants have the ability to challenge the trade secret status" of the June 14th documents. See Surreply of Defendant Chester Ho, p. 3.

In *United States v. Berrigan*, 482 F.2d 171 (3d Cir.1973), Father Philip Berrigan was charged with the crime of attempt to smuggle letters into and out of a federal prison without the knowledge and consent of the warden under 18 U.S.C. § 1791. At trial, the Government proved that Father Berrigan intended to take correspondence into the prison through a courier, believing that the warden did not know about the correspondence. In fact, however, the warden, as part of a "sting" operation, had prior knowledge of the arrangement and agreed to let the courier cooperate with the plan. Since the completed crime required the absence of the warden's consent, the Court of Appeals found that it was legally impossible to convict him of the crime of attempt. The panel noted that "Congress has not yet enacted a law that provides that intent plus act plus conduct constitutes the offense of attempt irrespective of legal impossibility ... [and][u]ntil such time as such legislative changes in the law take place, this court will not fashion a new non-statutory law of criminal attempt." *Id.* at 190.

Aside from the Third Circuit's decision in *Berrigan*, "every Circuit that has considered the defense of impossibility has rejected it." *Duran*, 884 F.Supp. at 580 (citing cases). Further, many courts have refused to distinguish legal versus factual impossibility because of its theoretical difficulty. *See, e.g., United States v. Darnell*, 545 F.2d 595, 597 (8th Cir.1976) (stating that legal and factual impossibility are logically indistinguishable);

*United States v. Parramore*, 720 F.Supp. 799, 800 (N.D.Cal.1989) ("Suffice it to say that the common law has rejected the impossibility defense.").

We also note that in the more recent opinion of *United States v. Everett*, 700 F.2d 900 (3d Cir.1983), our Court of Appeals moved away from *Berrigan* when it held that impossibility is no defense to the charge of attempted distribution of a controlled substance under 21 U.S.C. § 846. See id. at 908. In *Everett*, our Court of Appeals recognized that the doctrine of impossibility "ha[s] become 'a source of utter frustration,' plunging the state courts into a 'morass of confusion,'" and that it "ha[s] lost whatever acceptance at common law it may have possessed when the statute considered in *Berrigan* was first enacted in 1930." *Id.* at 905. Upon an examination of the legislative history of 21 U.S.C. § 846, the panel found that the doctrine of impossibility, "whose viability at common law was questionable at best, should not hamper federal efforts to enforce the drug laws." *Id.* at 907.

■ Similarly, an analysis of the legislative history of the EEA confirms that the defense of legal impossibility should not apply. The House Report evidences Congress's recognition of the importance of proprietary economic information to the economy of the United States, as well as the need to protect trade secrets as "a part of its national security interests." H.R. Rep. No. 104–788, at 4 (1996), *reprinted in* 1996 U.S.C.C.A.N. 4022–23. In view of this powerful interest in preventing the disclosure to foreign competitors of valued American trade secrets, Congress could not have intended to apply arcane common law defenses of factual or legal impossibility to the Act. If we found that the impossibility defense applied to the EEA, then FBI "sting" operations such as the one here would be difficult, if not impossible, to mount. We therefore find it highly unlikely that Congress intended to block "sting" operations under the EEA that have, as their

object, the prevention of the very disclosures Congress has criminalized.

■ Instead, we find that the better approach is that taken by the majority of Circuits that have addressed the impossibility defense:

> [A] defendant may be convicted of attempt where his objective conduct, taken as a whole, corroborates the requisite criminal intent. In essence, this view mirrors the dual elements of the crime of attempt: that the defendant had the specific intent to commit the substantive crime and that he took a substantial step towards the commission of that crime.

*Duran,* 884 F.Supp. at 582 (citing *Braxton v. United States,* 500 U.S. 344, 349, 111 S.Ct. 1854, 1858, 114 L.Ed.2d 385 (1991)(holding that to be responsible for the crime of attempting to kill a deputy marshal under 18 U.S.C. § 1114, the defendant "must have taken a substantial step towards that crime, and must have had the requisite *mens rea")).*

We therefore reject the defendants' claims of legal impossibility as applied to the EEA, but nevertheless find that they are entitled to review the June 14th documents to the extent of their constitutional rights discussed above.

For all of the foregoing reasons, we will deny the Government's motion for a protective order, and will instead adopt the protective order the defendants proffered to us, in the Order accompanying this Memorandum.

### ORDER

AND NOW, this 27th day of October, 1997, upon consideration of the Government's motion for a protective order, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. The Government's motion is DENIED; and

2. The "Stipulation" and Protective Order attached hereto is APPROVED and ADOPTED.

### STIPULATION AND PROTECTIVE ORDER

WHEREAS during the course of discovery in this case the government may be required to produce documents containing information that the government claims to be "trade secret" within the meaning of 18 U.S.C. § 1839(3); and

WHEREAS the defendants deem it appropriate to provide for the protection of such information without agreeing that the information is in fact a trade secret and preserving their rights to challenge such designation at a later time;

IT IS HEREBY **STIPULATED** AND **AGREED,** by and between the undersigned parties hereto through their respective counsel that the following definitions and procedures will govern the designation and handling of documents and other information produced by the government in this case:

1. Definitions:

a. "Confidential Material" shall mean information that the government contends is "trade secret" within the meaning of 18 U.S.C. § 1839(3).

b. "Discovery Material" shall mean all material disclosed by the government during discovery in this case.

2. The government may designate Discovery Material as Confidential Material to the extent that the government believes in good faith that the information or material is in fact Confidential Material as defined in paragraph 1(a)(i) above. Any labeling, segregation, or designation of Discovery Material as "Confidential Material" should be made, whenever possible, in the case of written, tangible, or documentary Discovery Material, at the time that Discovery Material is produced or made known to the defendants by stamping each page "CONFIDENTIAL" in a manner that is readily distinguishable from any pre-existing "Confidential" designation or by otherwise manifesting the intention that the Discovery Material be considered Confidential Material.

3. All Discovery Material that is designated "Confidential Material" shall be used solely to prepare for or conduct pretrial, trial, and appellate proceedings in this action.

4. All Discovery Material that is designated as Confidential Material shall be retained by the parties and their counsel and furnished, shown, disseminated, disclosed or divulged only to the following persons:

a. any of the defendants;

b. defense counsel;

c. witnesses and prospective witnesses to the extent reasonably deemed necessary by defense counsel to prepare for, or give, testimony regarding facts at issue in this case;

d. independent outside experts and consultants retained by the defendant(s) to furnish technical or expert services or give testimony in connection with this case; and

e. the Court, Court personnel, Court reporters, and the jury.

5. Before any disclosure or dissemination of any Confidential Material is made to any person in categories (c) and (d) in paragraph 4 above, defense counsel disclosing or disseminating the Confidential Material shall provide the person(s) who receive(s) or review(s) the Confidential Material with a copy of this Stipulation and Protective Order and shall obtain the agreement in writing in the form annexed hereto as Exhibit A of said person(s) to be bound by the terms and conditions hereof.

6. Nothing herein shall prohibit any of the defendants from using Confidential Material or from referring to or reciting any information contained in such Confidential Material in connection with any pleadings or motions filed in this action, provided that such Discovery Material shall be filed under seal or submitted to the Court for *in camera* inspection. The use of Confidential Material at trial or at pre- or post-trial hearings will be resolved at the time of the trial or hearing in question with the assistance of the Court if necessary.

7. All Confidential Material that is filed with the Court and any pleadings, motions or other papers filed with the Court disclosing information Confidential Material, shall be filed under seal and kept under seal until further order of the Court. Where possible, only the portion of such filings with the Court that are designated Confidential Material shall be filed under seal. Confidential Material filed under seal shall be filed with the Clerk of the Court in sealed envelopes prominently marked with the caption of this case and the notation:

"Contains Confidential Material:

To Be Opened Only as Directed
by the Court"

8. Upon final conclusion of this action, the parties hereby agree to the mutual return and/or destruction of all Confidential Material.

9. Nothing contained in this Stipulation and Protective Order shall preclude any party from applying to the Court for further relief or for modification of any provision hereof.

10. Should a dispute arise as to the propriety of any designation of Discovery Material as Confidential Material, defense counsel shall so notify the government in writing ("the Notice"). The Notice shall state defense counsel's position with regard to the matter in issue. Within seven business days from receipt of the Notice, the government will respond to the Notice. If after this exchange of correspondence, the parties cannot resolve their dispute, they may apply to the Court to do so. Any such dispute or the pendency of any such motion shall not be grounds for an objection to, or refusal to permit, discovery. During the pendency of the disputing party's motion and any appeal of the Court's decision on such motion and any appeal of the Court's decision on such motion, the Discovery Material shall be deemed Confidential Material and shall be covered by the provisions of this Stipulation and Protective Order.

11. Any Discovery Material that has been produced or disclosed in any other litigation and not designated Confidential in that litigation shall be deemed ineligible for treatment as Confidential Material pursuant to this Stipulation and Protective Order.

12. Information or facts contained in Discovery Material that is deemed Confidential Material but that is also independently available in Discovery Material or in other materials or information possessed or obtained by the parties may be used in motions, pleadings, and at trial and pre- and post-trial hearings, or in any other proper way, without regard to the provisions of this Stipulation and Protective Order.

13. No party to this Order has conceded (or shall be deemed to have conceded by entering into this Order) that any Discovery Material produced or disclosed by any other party or person or entity is "trade secret" within the meaning of 18 U.S.C. § 1839(3) or that it is entitled to protection as "Confidential Material."