

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-26-1998

# United States v. Hsu

Precedential or Non-Precedential:

Docket 97-1965

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

## Recommended Citation

"United States v. Hsu" (1998). *1998 Decisions.* Paper 205.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/205

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 26, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1965

UNITED STATES OF AMERICA

v.

KAI-LO HSU, a/k/a JAMES HSU

UNITED STATES OF AMERICA

v.

CHESTER S. HO

United States of America,
        Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Criminal Nos. 97-cr-323-1 and 97-cr-323-2)

Argued: June 10, 1998

Before: STAPLETON, COWEN, and RENDELL,
Circuit Judges

(Opinion Filed: August 26, 1998)

Michael R. Stiles
Walter S. Batty, Jr.
Richard W. Goldberg (ARGUED)
Louis D. Lappen
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
 Attorneys for Appellant

William E. McDaniels (ARGUED)
Paul Mogin
Williams & Connolly
725 Twelfth Street, N.W.
Washington, DC 20005

Thomas H. Suddath, Jr.
Montgomery, McCracken, Walker
 & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109
 Attorneys for Appellee,
 Chester S. Ho

Norman E. Greenspan
Ian M. Comisky
Blank Rome Comisky &
 McCauley LLP
One Logan Square
Philadelphia, PA 19103
 Attorneys for Appellee,
 Kai-Lo Hsu

OPINION OF THE COURT

RENDELL, Circuit Judge:

In this appeal we explore for the first time the relationship between the confidentiality provisions of the newly-enacted Economic Espionage Act of 1996, 18 U.S.C. S 1831, et seq., and principles of criminal law regarding discovery and disclosure of material evidence. The district court ordered the government to disclose alleged corporate trade secrets based upon a theory that we find does not

2

apply. It also held that the defense of legal impossibility does not pertain to the attempt and conspiracy crimes with which the defendants are charged. We will affirm the court's holding regarding the applicability of the defense of legal impossibility, but will reverse its discovery order and remand for a review of other asserted defenses to the crimes in the indictment.

I. FACTUAL AND PROCEDURAL BACKGROUND

A. The Government's Sting Operation

On July 10, 1997, a federal grand jury indicted Kai-Lo Hsu, Chester S. Ho, and Jessica Chou (collectively,"the defendants") for their involvement in an alleged conspiracy to steal corporate trade secrets from Bristol-Myers Squibb. The indictment alleges that the defendants sought to obtain the processes, methods, and formulas for manufacturing Taxol, an anti-cancer drug produced by Bristol-Myers and regarded by the company as a highly valuable trade secret.[1]

According to the indictment, the defendants' conspiracy began on June 7, 1995, when Chou, the Manager of Business Development for Yuen Foong Paper Company in Taiwan ("YFP"), requested information about Taxol from John Hartmann, an undercover FBI agent whom Chou mistakenly believed to be a technological information broker in the United States. From August 28, 1995, until January 12, 1996, Chou allegedly contacted Hartmann repeatedly to obtain information about Taxol manufacturing techniques and distribution. These contacts led to a meeting in Los Angeles on February 27, 1996, between Hartmann and Hsu, the Technical Director for YFP's operations. Hsu purportedly told Hartmann at that meeting that YFP wanted to diversify into biotechnology and to

_____

[1]. The factual summary that follows is based entirely on the as yet unproven allegations in the July 1997 indictment. Because this is an interlocutory appeal, the record is not complete, discovery has not concluded, and no determination of the facts has yet occurred. Therefore, we offer these facts as averred to provide a context for the issues on appeal, without vouching for the truth of any of the facts we recite.

3

introduce technology from advanced countries into Taiwan. When Hartmann responded that Bristol-Myers would be unlikely to share its secret technology with YFP, Hsu allegedly responded, "We'll get [it] another way," and told Hartmann to pursue paying Bristol-Myers employees for the confidential Taxol formulas.

The indictment asserts that Hsu and Chou then "communicated many times" with Hartmann over the next fourteen months to discuss the transfer of Taxol technology and to negotiate a specific price for the acquisition of Bristol-Myers's trade secrets. In response, Hartmann told the defendants that a corrupt Bristol-Myers scientist would be willing to sell Taxol information to YFP. The "corrupt" scientist was actually a Bristol-Myers employee cooperating with the FBI. Intrigued by such a prospect, Chou allegedly sent an e-mail to Hartmann on March 13, 1997, outlining the "core technology" that YFP would need to complete a deal, including:

> "1. The design and assembly of bioreactor with an agreed scale
> 2. Light requirement
> 3. Media requirement for growth and production
> 4. Operating mode for the process, such as batch or continuous
> 5. Yield, such as cell density, titers, taxane constitution
> 6. Duration of culture to reach the maximal yield
> 7. Scientific names of yew species which are applicable to the bioreactor.
> 8. Cell lines excluded!!!"

Chou also allegedly told Hartmann that she would offer $400,000 in cash, stock, and royalties to the Bristol-Myers scientist in exchange for his disclosure of the Taxol secrets. In addition, Chou and Hsu purportedly began making arrangements for a 1997 meeting between the parties, the purpose of which was for YFP to establish the authenticity of the "corrupt" scientist and to determine whether Hartmann really could produce the Taxol trade secrets that Chou and Hsu had requested.

Hartmann agreed to a meeting, and on June 14, 1997, he and the Bristol-Myers scientist met with three

4

representatives from YFP, including Hsu, Ho, and another unidentified scientist, at the Four Seasons Hotel in Philadelphia. Ho was a professor of biotechnology and the Director of the Biotechnology Innovation Center at the National Chiao Tung University in Taiwan, and he had apparently been asked to evaluate the Taxol technology at the meeting as a favor to YFP.

The indictment alleges that the bulk of the June 14 meeting consisted of detailed discussions regarding the manufacturing processes for Taxol. The Bristol–Myers scientist explained the background and history of Taxol production, and displayed copies of Bristol–Myers documents outlining specific technological processes and scientific data pertaining to the manufacture of the drug. According to the indictment, these documents contained trade secrets and were "clearly marked with Bristol–Myers identification as well as the block stamped word `CONFIDENTIAL.' " Hsu, Ho, and the other YFP employee reviewed the documents during the meeting and purportedly asked the Bristol–Myers scientist "numerous" questions regarding specific areas of Taxol technology. Finally, after Hartmann and the Bristol–Myers scientist left the room, the FBI rushed in and arrested Hsu and Ho at the hotel.[2]

The indictment returned by the grand jury charged Hsu, Ho, and Chou with six counts of wire fraud in violation of 18 U.S.C. S 1343, one count of general federal conspiracy in violation of 18 U.S.C. S 371, two counts of foreign and interstate travel to facilitate commercial bribery in violation of 18 U.S.C. S 1952(a)(3), one count of aiding and abetting in violation of 18 U.S.C. S 2, and, most importantly for our purposes, two counts of criminal activity under the Economic Espionage Act of 1996 ("the EEA"), including attempted theft of trade secrets, and a conspiracy to steal trade secrets, in violation of 18 U.S.C. SS 1832 (a)(4) and (a)(5).

_____

2. An arrest warrant has since been issued for Chou, but she lives in Taiwan, which has no extradition treaty with the United States.

5

B. The Government's Motion to Maintain the
Confidentiality of the Bristol-Myers Trade Secrets

Shortly after the indictment was returned, the defense
requested in discovery a copy of the Bristol-Myers
documents disclosed to Hsu and Ho at the June 14
meeting. However, on August 12, 1997, the government
filed a motion pursuant to 18 U.S.C. S 1835 and Fed. R.
Crim. P. 16(d)(1) for a protective order to prevent the
disclosure of the Bristol-Myers trade secrets allegedly
contained in those documents.3 The government proposed
that the district court enter an order under which the trial
judge would review the documents and the proposed
redactions by Bristol-Myers in camera, and would then
permit redactions of proprietary secret information. The
documents as redacted would be used at trial. The
gravamen of the government's contention was that the
defendants had no need for the actual trade secrets
themselves, because they had been charged only with
attempt and conspiracy to steal trade secrets, rather than
with the actual theft of trade secrets, under the EEA.

The defendants maintained, though, that unique
constitutional and procedural requirements of criminal
prosecutions dictated full access to the documents shown
to them during the investigation. The defendants also
contended that they needed the documents to establish the
defense of legal impossibility, arguing that they could not
be convicted of attempting to steal trade secrets if the
documents did not actually contain trade secrets.
Therefore, they proposed an order under which the
proprietary information in the Bristol-Myers documents
would be disclosed, but only to select members of the

_____

3. Section 1835 is part of the EEA and provides, inter alia, that "[i]n any
prosecution or other proceeding under this chapter, the court shall enter
such orders and take such other action as may be necessary and
appropriate to preserve the confidentiality of trade secrets, consistent
with the requirements of the Federal Rules of Criminal and Civil
Procedure, the Federal Rules of Evidence, and all other applicable laws."
Rule 16(d)(1) provides in relevant part that "[u]pon a sufficient showing
the court may at any time order that the discovery or inspection be
denied, restricted, or deferred, or make such other order as is
appropriate."

defense team, such as the defendants' attorneys and trial experts, and under which the documents would befiled under seal and returned or destroyed at the end of the case.

The district court agreed with the defendants and adopted their version of the proposed protective order. See United States v. Hsu, 982 F. Supp. 1022 (E.D. Pa. 1997). The court held that legal impossibility is not a viable defense to the crime of attempted theft of trade secrets under the EEA, and it thus rejected the defendants' argument that they needed the documents to establish that claim. Id. at 1028-29. Nevertheless, it ordered the government to divulge the alleged trade secrets, because it found that the existence of a trade secret is an essential element of the crime of the theft of trade secrets, and that the existence of a trade secret in that prosecution is "a question of fact which the defendants have the right to have a jury decide." Id. at 1024. Believing the defendants to be charged both with actual theft and attempted theft of trade secrets, the court concluded that "if during discovery we deny to the defendants complete access to the Taxol technology, we inhibit their constitutional right to effective cross-examination as well as their right to have a jury, rather than a judge, determine whether a `trade secret' exists." Id. at 1025. Therefore, the court held, the defendants "are entitled to review the June 14th documents to the extent of their constitutional rights." Id. at 1029.

The district court's opinion "encourage[d]" the government to file an interlocutory appeal to clarify the "unsettled and important questions of law" raised by this case. Id. at 1022 n.1. Accordingly, the government appealed the district court's Order on November 25, 1997, pursuant to a section in the EEA providing that "[a]n interlocutory appeal by the United States shall lie from a decision or order of a district court authorizing or directing the disclosure of any trade secret." 18 U.S.C. S 1835. We now have jurisdiction under that section, and we exercise plenary review over the novel legal questions presented by

7

the government's appeal. In re Grand Jury, 111 F.3d 1066, 1069 n.4 (3d Cir. 1997).4

We note at the outset that we disagree with the district court as to the offenses charged. The indictment is limited to charging the defendants with attempt and conspiracy and contains no charge of actual theft of trade secrets. As we will discuss below, we believe this changes the analysis greatly. We begin, though, with an overview of the EEA and an analysis of the relevant statutory provisions.

II. THE ECONOMIC ESPIONAGE ACT OF 1996

The EEA became law in October 1996 against a backdrop of increasing threats to corporate security and a rising tide of international and domestic economic espionage. The end of the Cold War sent government spies scurrying to the private sector to perform illicit work for businesses and corporations, S. Rep. No. 104–359, at 7 (1996), and by 1996, studies revealed that nearly $24 billion of corporate intellectual property was being stolen each year. Richard J. Heffernan & Dan T. Swartwood, Trends in Intellectual Property Loss 4, 15 (1996).

The problem was augmented by the absence of any comprehensive federal remedy targeting the theft of trade secrets, compelling prosecutors to shoehorn economic espionage crimes into statutes directed at other offenses.5

_____

4. The issues are "novel" in part because this is a matter of first impression in the federal courts. Only five EEA prosecutions were publicly announced in the first eighteen months of the statute's existence, and none had proceeded to trial as of March 1998. See Lorin L. Reisner, Criminal Prosecution of Trade Secret Theft, N.Y.L.J., March 30, 1998, at 1. Furthermore, EEA prosecutions are likely to remain infrequent in the near future, because the Attorney General of the United States has pledged that the government will not, until October 2001, pursue charges under the EEA "without the personal approval of the Attorney General, the Deputy Attorney General, or the Assistant Attorney General for the Criminal Division (or the acting official in each of these positions if a position is filled by an acting official)." 142 Cong. Rec. S12,214 (daily ed. Oct. 2, 1996) (letter of Janet Reno).

5. Prior to the passage of the EEA, the only federal statute directly prohibiting economic espionage was the Trade Secrets Act, 18 U.S.C.

8

For example, the government often sought convictions under the National Stolen Property Act ("NSPA"), 18 U.S.C. S 2314, or the mail and wire fraud statutes, 18 U.S.C. SS 1341 and 1343. However, the NSPA "was drafted at a time when computers, biotechnology, and copy machines did not even exist," S. Rep. No. 104-359, at 10, 6 and industrial espionage often occurred without the use of mail or wire.7 Consequently, it soon became clear to legislators and commentators alike that a new federal strategy was

_____

S 1905, which forbids the unauthorized disclosure of confidential government information, including trade secrets, by a government employee. See, e.g., United States v. Wallington, 889 F.2d 573 (5th Cir. 1989) (upholding a defendant's conviction under S 1905 for running background checks on persons whom the defendant's friend suspected of trafficking in narcotics). However, the Trade Secrets Act was of limited value, because it did not apply to private sector employees and it provided only minor criminal sanctions of a fine and not more than one year in prison.

6. In fact, several cases cast serious doubt as to whether the NSPA even applies to the type of intangible information involved in modern schemes of corporate espionage. See, e.g., Dowling v. United States, 473 U.S. 214, 216 (1985) (stating that the NSPA "seems clearly to contemplate a physical identity between the items unlawfully obtained and those eventually transported, and hence some prior physical taking of the subject goods"); United States v. Brown, 925 F.2d 1301, 1307-08 (10th Cir. 1991) (holding that the theft of purely intellectual property is not punishable by the NSPA because it is not physical property within the meaning of the statute).

7. State remedies were also of little assistance. As of 1996, at least twenty-four states had criminal statutes directed at the theft of trade secrets, James H.A. Pooley, et al., Understanding the Economic Espionage Act of 1996, 5 Tex. Intell. Prop. L.J. 177, 186 (1997), and forty-four states and the District of Columbia had adopted some form of the Uniform Trade Secrets Act, which permits civil actions to enjoin and obtain damages for actual and attempted misappropriation of trade secrets. Victoria A. Cundiff, The Economic Espionage Act and You, 490 PLI/Pat 9, 27 (1997). Yet the states often lacked sufficient resources to pursue espionage prosecutions, see Pooley, supra, at 186, and corporations eschewed bringing civil lawsuits, because they had to shoulder their own litigation costs, individual defendants were frequently judgment proof, and it proved difficult for the state courts to exercise jurisdiction over lawsuits involving out-of-state defendants. See Cundiff, supra, at 27.

needed to combat the increasing prevalence of espionage in corporate America. Congress recognized "the importance of developing a systematic approach to the problem of economic espionage," H. Rep. No. 104-788, at 7 (1996), reprinted in 1996 U.S.C.C.A.N. 4021, 4025, and stressed that "[o]nly by adopting a national scheme to protect U.S. proprietary economic information can we hope to maintain our industrial and economic edge and thus safeguard our national security." S. Rep. No. 104-359, at 11. The House and Senate thus passed the Economic Espionage Act, and the President signed the bill into law on October 11, 1996.

The EEA consists of nine sections which protect proprietary information from misappropriation. Three sections are of particular import to our analysis: what acts are penalized by the statute, how the law defines a "trade secret," and when trade secrets are to remain confidential.

A. Criminal activities

The EEA criminalizes two principal categories of corporate espionage, including "Economic espionage" as defined by 18 U.S.C. S 1831, and the "Theft of trade secrets" as defined by S 1832.8  The former provision punishes those who knowingly misappropriate, or attempt or conspire to misappropriate, trade secrets with the intent or knowledge that their offense will benefit a foreign government, foreign instrumentality, or foreign agent. The legislative history indicates that S 1831 is designed to apply only when there is "evidence of foreign government sponsored or coordinated intelligence activity." 142 Cong. Rec. S12,212 (daily ed. Oct. 2, 1996) (Managers' Statement for H.R. 3723). By contrast, S 1832, the section under which the defendants are charged, is a general criminal trade secrets provision. It applies to anyone who knowingly engages in the theft of trade secrets, or an attempt or conspiracy to do so, "with intent to convert a trade secret, that is related to or included in a product that is produced for or placed in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof,

---

8. The EEA also permits parallel civil actions to "obtain appropriate injunctive relief against any violation" of the statute. 18 U.S.C. S 1836(a).

10

and intending or knowing that the offense will, injure any owner of that trade secret." Section 1832(a) makes clear that attempt and conspiracy are distinct offenses, and it lists them separately from those acts that constitute completed crimes under the statute.

Section 1832 also contains at least three additional limitations not found in S 1831. First, a defendant charged under S 1832 must intend to convert a trade secret "to the economic benefit of anyone other than the owner thereof," including the defendant himself. This "economic benefit" requirement differs from S 1831, which states merely that the offense "benefit," in any manner, a foreign government, instrumentality, or agent. Therefore, prosecutions under S 1832 uniquely require that the defendant intend to confer an economic benefit on the defendant or another person or entity. Second, S 1832 states that the defendant must intend or know that the offense will injure an owner of the trade secret, a restriction not found in S 1831. The legislative history indicates that this requires "that the actor knew or was aware to a practical certainty that his conduct would cause such a result." S. Rep. No. 104-359, at 15. Finally, unlike S 1831, S 1832 also requires that the trade secret be "related to or included in a product that is produced for or placed in interstate or foreign commerce."9

B. What constitutes a "trade secret"

The EEA defines a "trade secret" to expressly extend protection to the misappropriation of intangible information for the first time under federal law. 18 U.S.C. S 1839(3) provides that a "trade secret" means:

_____

9. Section 1832 also imposes more lenient punishments than S 1831. Under S 1832, individuals can be sentenced to ten years in prison and/or fined $250,000, and organizations can befined up to $5 million. Section 1831, however, provides that individuals can be imprisoned for fifteen years and/or fined $500,000, and organizations can be fined a maximum of $10 million. Moreover, under both sections, defendants are subject to criminal forfeiture pursuant to 18 U.S.C.S 1834, which states that a person or entity shall forfeit any property constituting, or derived
from, the proceeds of an EEA crime, and, if the sentencing court "in its discretion so determines," any property used, or intended to be used, to commit or facilitate an EEA offense.

11

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if --

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public.

The EEA's definition of a "trade secret" is similar to that found in a number of state civil statutes and the Uniform Trade Secrets Act ("UTSA"), a model ordinance which permits civil actions for the misappropriation of trade secrets.10 There are, though, several critical differences which serve to broaden the EEA's scope. First, and most importantly, the EEA protects a wider variety of technological and intangible information than current civil laws. Trade secrets are no longer restricted to formulas, patterns, and compilations, but now include programs and codes, "whether tangible or intangible, and whether or how stored." Second, the EEA alters the relevant party from whom proprietary information must be kept confidential. Under the UTSA, information classified as a "trade secret" cannot be generally known by businesspersons or

_____

10. For example, S 1(4) of the UTSA states that a "trade secret" includes:

information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(i) derives independent economic value, actual or potential, from not
being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12

competitors of the trade secret owner. UTSA S 1(4). The EEA, however, indicates that a trade secret must not be generally known to, or readily ascertainable by, the general public, rather than simply those who can obtain economic value from the secret's disclosure or use. Finally, the EEA contains a definition crafted to reach only illicit behavior. Although legislators eliminated language providing that general knowledge, skills, and experience are not"trade secrets," 142 Cong. Rec. S12,213 (daily ed. Oct. 2, 1996) (Managers' Statement), it is clear that Congress did not intend the definition of a trade secret to be so broad as to prohibit lawful competition such as the use of general skills or parallel development of a similar product. See, e.g., id. at S12,212 (noting that "[t]his legislation does not in any way prohibit companies, manufacturers, or inventors from using their skills, knowledge and experience to solve a problem or invent a product that they know someone else is working on").

C. Preservation of confidentiality

The EEA also contains a provision designed to preserve the confidentiality of trade secrets during criminal prosecutions. 18 U.S.C. S 1835 states that a court:

> shall enter such orders and take such other action as may be necessary and appropriate to preserve the confidentiality of trade secrets, consistent with the requirements of the Federal Rules of Criminal and Civil Procedure, the Federal Rules of Evidence, and all other applicable laws. An interlocutory appeal by the United States shall lie from a decision or order of a district court authorizing or directing the disclosure of any trade secret. (emphasis added).

This section does not, of course, abrogate existing constitutional and statutory protections for criminal defendants. It does, however, represent a clear indication from Congress that trade secrets are to be protected to the fullest extent during EEA litigation. Moreover, it further encourages enforcement actions by protecting owners who might otherwise "be reluctant to cooperate in prosecutions for fear of further exposing their trade secrets to public

13

view, thus further devaluing or even destroying their worth." H.R. Rep. No. 104-788, at 13, 1996 U.S.C.C.A.N. at 4032. Therefore, as with the definition of trade secrets, the confidentiality provision aims to strike a balance between the protection of proprietary information and the unique considerations inherent in criminal prosecutions.

III. DISCUSSION

With this statutory framework in mind, we turn our attention to determining whether the district court properly ordered the government to disclose the alleged trade secrets in this case. We begin by recognizing that the defendants are charged only with attempting to steal, and conspiring to steal, trade secrets under S 1832. The district court believed that the defendants were charged with both attempted theft of trade secrets as well as with "the completed offense of unauthorized conveyance of a trade secret under 18 U.S.C. S 1832(2)." 982 F. Supp. at 1023 (emphasis added). It thus found that the defendants' constitutional rights to cross-examination and a fair trial would be violated absent full disclosure of the Bristol-Myers documents.

However, the district court's analysis represents an incorrect reading of the indictment and a mistaken view of the charges lodged under the EEA. For one thing, there is no S 1832(2) in the statute. More importantly, the defendants are not charged with the completed offense of theft of trade secrets. They have been indicted only for attempting to steal, and conspiring to steal, trade secrets pursuant to SS 1832(a)(4) and (a)(5). Therefore, our task is to examine the defendants' entitlement to the information they seek, as defending against the attempt and conspiracy provisions of the EEA, rather than the completed theft provisions. We need not decide, as the district court did, whether a failure to disclose trade secrets would undermine the constitutional rights of defendants charged with a completed offense under the statute.

The defendants argue that unfettered access to confidential documents is required even in EEA prosecutions for attempt and conspiracy. They assert that documents containing trade secrets are "material to the

14

preparation of the defendant's defense," and therefore, that they must be disclosed consistent with the terms of Fed. R. Crim. P. 16(a)(1)(C).11 In particular, they contend that disclosure is warranted by (1) the availability of a legal impossibility defense, and (2) their need for access to the proprietary information as it relates to their defense of the allegations of the indictment and other defenses to the crimes charged.12

## A. Legal Impossibility: The Relationship of the Existence of Trade Secrets to the Crimes Charged

As previously mentioned, the district court believed that the defendants had been charged with the substantive offense of theft of trade secrets, and, without addressing in any detail the EEA's concern for confidentiality of trade secrets in prosecutions under the statute, concluded that the defendants' constitutional rights required disclosure of the redacted material. The court premised its view on the fact that the existence of a trade secret was an element of the offense, and that the defendants thus had a constitutional right to access the alleged secrets based on the due process and fair trial guarantees of the Fifth and Sixth Amendments.13 We need not determine whether the

_____

11. It should be noted that the information sought to be disclosed here includes those portions of the documents used at the June 14 meeting which Bristol-Myers redacted before providing them to anyone, including their counsel. The district court did not examine the redactions or assess their true materiality. We have been advised by counsel for the government that the redactions consist of technical information that constitutes trade secrets under any definition.

12. The defendants also argue that disclosure is warranted because the government has not met its burden of proving the need for a protective order precluding discovery of the documents. However, their argument is based entirely on the language of Federal Rule of Civil Procedure 26(c) and on the cases interpreting its requirements in civil actions. See, e.g., Smith v. BIC Corp., 869 F.2d 194, 199 (3d Cir. 1989). No such burden-shifting or elements of proof exist under the facts of this case, where the government seeks to protect trade secrets in a criminal prosecution under the provisions of the EEA.

13. Although seeking to address the government's interests in the confidentiality of trade secrets, the district court concentrated on the defendants' rights and did not engage in any discussion of the relationship between the two.

district court was correct in its ruling, because the crimes actually charged do not include the substantive offense of theft of trade secrets. Rather, the crimes charged-- attempt and conspiracy -- do not require proof of the existence of an actual trade secret, but, rather, proof only of one's attempt or conspiracy with intent to steal a trade secret. 18 U.S.C. S 1832(a).14 We must determine how and to what extent this alters the analytic landscape, including statutory and policy considerations regarding confidentiality under the EEA, and principles of disclosure of material information under the federal criminal rules.

It should be noted at the outset that the confidentiality provision of the EEA does not exist in a vacuum. As the EEA provides in S 1835, confidentiality must coexist with or be tempered by other principles of the law, including a defendant's constitutional rights and the Federal Rules of Criminal Procedure. Therefore, we must first ask whether the non-disclosure of trade secret data does have implications if a defendant is defending against charges of attempt and conspiracy to steal trade secrets. The answer lies in the resolution of the question of whether the non-existence of a trade secret matters in defense of an attempt or conspiracy crime. If the defense of legal impossibility is viable -- that is, if the defendants are not guilty of attempt if the material is not truly a trade secret -- then it could matter, and the defendants' constitutional or statutory rights could be implicated. If the defense of legal impossibility is not cognizable, then the existence or non-existence of an actual trade secret is of little consequence for an attempt or conspiracy crime. Thus, we willfirst

_____

14. See, e.g., Model Penal Code S 5.01(1)(c) (declaring a defendant guilty of attempt when, "acting with the kind of culpability otherwise required for commission of the crime, he ... purposely does or omits to do anything that, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime"); id. at S 5.02(1)(a) (stating that a defendant is guilty of conspiracy with other persons if, "with the purpose of promoting or facilitating[the crime's] commission he agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime").

16

address the threshold question of whether legal impossibility is a defense to crimes of attempt and conspiracy, as this discussion frames the remainder of our analysis.15

1. Attempt

The defendants' primary contention in the district court, and one of their principal arguments on appeal, is that they need to view the unredacted Taxol documents to prove their defense of legal impossibility. They assert that they can successfully defend against a charge of attempt to steal trade secrets if the documents used at the June 14, 1997, meeting did not actually contain trade secrets. Only by disclosure can they determine whether the materials did, in fact, contain proprietary information, and therefore mount their defense.

The law of impossible attempts has received much scholarly attention, but remains a murky area of the law. The common law distinguishes between two types of impossibilities -- legal and factual -- and provides that the former is a defense while the latter is not. In this regard, "[l]egal impossibility is said to occur where the intended acts, even if completed, would not amount to a crime." United States v. Berrigan, 482 F.2d 171, 188 (3d Cir. 1973).16

_____

15. We emphasize that we need not reach, and are not determining, the issue addressed by the district court of whether the disclosure of trade secrets is mandated by the Constitution or the Federal Rules of Criminal Procedure if a defendant is charged with the actual theft of trade secrets.
This is a complex issue. For one thing, whether information qualifies as an actual "trade secret" is precisely defined by the EEA, and centers on such factual questions as how the information has been guarded by its owner and whether it is ascertainable by the public, rather than on the content of the secret or the defendant's requests as such. This raises an issue as to whether the information or formula itself is in fact material to the existence of the trade secret. In addition, the other elements of the
offense, and the available defenses, may differ significantly if the defendant is accused of a completed crime rather than a crime of attempt or conspiracy.

16. This type of legal impossibility is actually what some commentators have termed "hybrid" legal impossibility, because the actor's goal is

By contrast, "factual impossibility is said to occur when extraneous circumstances unknown to the actor or beyond his control prevent consummation of the intended crime." Id. For example, legal impossibility occurs when A shoots a corpse believing it to be alive and intending to commit murder; the attempt does not amount to murder even if completed. Factual impossibility occurs when A fires a gun at a bed intending to kill V, and V is not on the bed; the crime cannot be completed because of extraneous factors beyond A's control.

The difficulty, of course, is that the distinction between factual and legal impossibility is essentially a matter of semantics, for every case of legal impossibility can reasonably be characterized as a factual impossibility. For instance, the fact that A shoots a corpse, rather than a person, is also a product of circumstances beyond A's control; A did not commit murder because the person he intended to kill was already dead. Likewise, in the case at bar, the defendants argue that their crimes would have been legally impossible if the redacted portions of the June 14 documents did not contain trade secrets. Yet this could just as easily be characterized as a factual impossibility, because extraneous circumstances unknown to the defendants, i.e., that documents they believed to contain trade secrets really did not, would have prevented the consummation of their crime.

As a result, the great majority of jurisdictions have now recognized that legal and factual impossibility are "logically indistinguishable," United States v. Darnell, 545 F.2d 595,

_____

illegal, but commission of the offense is somehow rendered impossible by attendant circumstances. See, e.g., Joshua Dressler, Understanding Criminal Law, S 27.07[D], at 372 (2d ed. 1995). Another type of legal impossibility -- "pure" legal impossibility-- occurs when the law does not even "proscribe the goal that the defendant sought to achieve." Ira P. Robbins, Attempting the Impossible: The Emerging Consensus, 23 Harv. J. on Legis. 377, 389 (1986). Pure legal impossibility is always a defense.
For example, a hunter cannot be convicted of attempting to shoot a deer if the law does not prohibit shooting deer in thefirst place. Therefore, we
make clear that our discussion refers only to "hybrid" legal impossibility as we have defined it.

18

597 (8th Cir. 1976), and have abolished impossibility as a defense. See, e.g., United States v. Quijada, 588 F.2d 1253, 1255 (9th Cir. 1978) (eschewing any effort to distinguish between the two concepts); United States v. Duran, 884 F. Supp. 577, 580 n.5 (D.D.C. 1995) (noting that "categorizing a case as involving legal versus factual impossibility is difficult, if not pointless."), aff'd , 96 F.3d 1495 (D.C. Cir. 1996).

In fact, we are the only circuit which continues to recognize a common law defense of legal impossibility. We established its validity in United States v. Berrigan, 482 F.2d at 190, where we held that legal impossibility is a defense to certain crimes of attempt. Berrigan involved a federal prisoner convicted of attempting to smuggle letters in and out of a federal prison without the knowledge and consent of the warden, in violation of 18 U.S.C.S 1791 and 28 C.F.R. S 6.1. The evidence showed that the defendant used another prisoner on study-release as a courier for his mail, believing all along that the warden was not aware of the duo's scheme. However, the warden had learned of the defendant's first correspondence, and, working with the police, he allowed the courier to carry all subsequent letters with his knowledge and consent. Thus, the defendant argued that his crime was legally impossible; he had been charged with attempt to smuggle letters without the warden's knowledge and consent, and yet the warden both knew and consented to the crime.

On appeal, we agreed with the defendant and held that his crime was legally impossible. We recognized that "elimination of impossibility as a defense . . . is consistent with the overwhelming modern view," 482 F.2d at 186 (quotation omitted), but we concluded that legal impossibility remains a valid defense to common law crimes of attempt in this circuit. Emphasizing that "[f]ederal criminal law is purely statutory," id. at 185, we wrote that we had no choice but to recognize a defense of legal impossibility in the absence of a federal statute providing otherwise. Id. at 190. Therefore, we stated,"attempting to do that which is not a crime is not attempting to commit a crime." Id.

19

In subsequent years, however, we have explored and defined Berrigan's reach and have recognized exceptions to the Berrigan rule. In United States v. Everett, we held that legal impossibility was "no defense to the charge of attempted distribution of a controlled substance under 21 U.S.C. S 846 (1976)." 700 F.2d 900, 908 (3d Cir. 1983). In that case, a jury convicted the defendant of attempting to distribute the drug phenyl-2-propanone in violation of the Comprehensive Drug Abuse Prevention and Control Act ("the Drug Control Act"). However, the liquid Everett gave to an undercover agent was not, in fact, a controlled substance. Relying on Berrigan, Everett thus argued that his conviction should be set aside as having been legally impossible; he was convicted of an attempt to distribute drugs, but the substance he distributed was not actually a narcotic.

We rejected Everett's argument and held that Berrigan did not apply to the Drug Control Act. We noted that Berrigan was a case of statutory interpretation, and we found that we should limit its reasoning to the particular law in that case (18 U.S.C. S 1791). As our opinion stated, "[w]e cannot rest on Berrigan's interpretation of what Congress meant by the word `attempts' when it enacted 18 U.S.C. S 1791. Instead we must examine legislative intent anew. If Congress chose in enacting [the Drug Control Act] to define `attempt' to punish efforts to [distribute narcotics] regardless of impossibility, that intent governs." 700 F.2d at 904. Therefore, we reviewed the legislative history of the Drug Control Act, and we concluded that "Congress intended to eliminate the defense of impossibility when it enacted section 846." Id.

We agree with Everett's analysis and we believe it should be employed in this case. Consistent with Everett, we should resort to legislative intent to determine whether Congress meant to permit a defense of impossibility to an "attempt" crime under the EEA. When Congress uses a common law term such as "attempt," we generally presume that it intended to adopt the term's widely-accepted common law meaning, including any common law defenses such as impossibility. United States v. Cicco, 10 F.3d 980, 984 (3d Cir. 1993). However, as Everett recognized, "the

20

courts will not impose that meaning if there are `grounds for inferring an affirmative instruction from Congress' to define it otherwise." 700 F.2d at 904 (quoting Morissette v. United States, 342 U.S. 246, 273 (1952)).

After reviewing the legislative history of the EEA, we conclude that Congress did not intend to allow legal impossibility to be asserted as a defense to attempt crimes created by its terms. Congress never spoke directly as to why it used the term "attempt," or as to the issue of legal impossibility, in any of the reports or debates on the statute. We find, however, that, as we held in Everett, the underlying purposes of the law provide substantial evidence of a congressional intent that the defense of legal impossibility should not apply.

One of the key findings in Everett was that the Drug Control Act was designed to offer a "comprehensive" solution to narcotics offenses. 700 F.2d at 906-07. We concluded from this that Congress could not have intended to adopt the impossibility defense, "whose viability at common law was questionable at best," because doing so would only "hamper federal efforts to enforce the drug laws." Id. at 907.

Here, the very same goals, and the very same language, appear throughout the legislative history of the EEA. Just as the Drug Control Act embraced a "comprehensive" solution for drug trafficking, so too does the EEA attempt to provide a "comprehensive" mechanism for curtailing the escalating threat of corporate espionage. The Senate Report includes an entire section entitled "Need for a Comprehensive Federal Law," and "underscore[s] the importance of developing a systematic approach to the problem of economic espionage." S. Rep. No. 104-359, at 11. The Report notes that "a Federal criminal statute will provide a comprehensive approach to [the theft of trade secrets] -- with clear extraterritoriality, criminal forfeiture, and import-export sanction provisions." Id. at 12. Likewise, the House Report states that the EEA is designed to provide a "systematic approach" to trade secret theft, and asserts that "a comprehensive federal criminal statute will better facilitate the investigation and prosecution of this crime." H.R. Rep. No. 104-788, at 7, 1996 U.S.C.C.A.N. at 4025.

21

The House also explained that the EEA was crafted to punish virtually every form of illegal industrial espionage, "from the foreign government that uses its classic espionage apparatus to spy on a company, to the two American companies that are attempting to uncover each other's bid proposals, or to the disgruntled former employee who walks out of his former company with a computer diskette full of engineering schematics." Id. at 5, 1996 U.S.C.C.A.N. at 4024.17

In an effort to undermine this evidence of intent, the defendants offer the statement of Senator Herbert Kohl, a co-sponsor of the trade secrets legislation, who commented that the EEA should "only be used in flagrant and egregious cases of information theft." 142 Cong. Rec. S12,212 (daily ed. Oct. 2, 1996). The defendants contend that this demonstrates an intent to limit the statute's reach. However, the Senator's remarks are taken out of context. His entire statement reads, in pertinent part, as follows:

> [W]e have carefully drafted these measures to ensure that they can only be used in flagrant and egregious cases of information theft. Moreover, trade secrets are carefully defined so that the general knowledge and experience that a person gains from working at a job is not covered.
>
> Mr. President, we do not want this law used to stifle the free flow of information or of people from job to job. But we built in a number of safeguards to prevent exactly these problems.

Id. Senator Kohl did not intend to limit the statute's comprehensive scope. He meant merely to allay any fears that the government would use the EEA to police clearly

_____

17. Individual legislators echoed these goals as well, declaring that the EEA would serve as a "comprehensive statute" to combat corporate espionage. 142 Cong. Rec. H10,461 (daily ed. Sept. 17, 1996) (statement of Rep. Hyde). Even the President himself stated upon signing the bill that "[t]his Act establishes a comprehensive and systematic approach to trade secret theft and economic espionage." Statement by President William J. Clinton Upon Signing H.R. 3723, reprinted in 1996 U.S.C.C.A.N. 4034, 4034.

22

innocuous and otherwise lawful behavior, such as occurs when employees change jobs or start their own companies using general knowledge that they have acquired through prior employment. See, e.g., Sen. Rep. No. 104-359, at 12 (clarifying that the EEA "does not apply to innocent innovators or to individuals who seek to capitalize on their lawfully developed knowledge, skill or abilities"). We do not read Senator Kohl's comments as undermining the comprehensiveness of the statute as it pertains to the theft of trade secrets. We believe that the great weight of the EEA's legislative history evinces an intent to create a comprehensive solution to economic espionage, and wefind it highly unlikely that Congress would have wanted the courts to thwart that solution by permitting defendants to assert the common law defense of legal impossibility.

We also find it significant, as Everett did, that the statute we are considering was drafted at a time when "the doctrine of impossibility had become mired in fine distinctions and had lost whatever acceptance at common law it may have possessed when the statute considered in Berrigan was first enacted in 1930." 700 F.2d at 905. The EEA was drafted in 1996, more than twenty-five years after the National Commission on Reform of the Federal Criminal Laws had concluded that the abolition of legal impossibility was already "the overwhelming modern position." Id. (quotation omitted). In fact, to this day, "[a]side from the Third Circuit in Berrigan, every Circuit that has considered the defense of impossibility has rejected it." Duran, 884 F. Supp. at 580 (emphasis added). Thus, we doubt that Congress meant to permit legal impossibility to be asserted as a defense to EEA crimes.

Finally, we are mindful, as Everett was, 700 F.2d at 907 n.16, of the potential damage that the defendants' position could work on law enforcement under the statute. If we were to hold that legal impossibility is a defense to the attempted theft of trade secrets, the government would be compelled to use actual trade secrets during undercover operations in order to obtain convictions underS 1832(a)(4).18

_____

18. The government claims that it used documents containing actual trade secrets in this case, only "because of the difficulty in preparing on
short notice documents which appeared to be authentic for presentation to the trained scientists brought to the meeting by Hsu." (Gov't. Reply Br. at 4 n.3.)

23

Aside from the logistical difficulties this would create, it would also have the bizarre effect of forcing the government to disclose trade secrets to the very persons suspected of trying to steal them, thus gutting enforcement efforts under the EEA. We believe Congress could not have intended such a result, inasmuch as it was striving to prevent economic espionage and to maintain the confidentiality of trade secrets. Therefore, given the strong indicia of legislative intent, and given the practical import of a contrary finding, we conclude that Congress could not have intended EEA attempt crimes to be subject to the somewhat obscure and rarely used common law defense of legal impossibility.

Accordingly, we hold that legal impossibility is not a defense to a charge of attempted misappropriation of trade secrets in violation of 18 U.S.C. S 1832(a)(4). We agree with the district court's conclusion that a charge of "attempt" under the EEA requires proof of the same elements used in other modern attempt statutes, including the Model Penal Code. A defendant is guilty of attempting to misappropriate trade secrets if, "acting with the kind of culpability otherwise required for commission of the crime, he ... purposely does or omits to do anything that, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." Model Penal Code S 5.01(1)(c) (1985).19 Thus, the defendant must (1) have the intent needed to commit a crime defined by the EEA, and must (2) perform an act amounting to a "substantial step" toward the commission of that crime. See Cicco, 10 F.3d at 984-85 (attempt crimes

_____

19. We adopt the Model Penal Code ("MPC") test for attempt because it is consistent with our own caselaw and with the great weight of modern precedent. We have indicated that the MPC constitutes "well-settled principles of the law of attempt," United States v. Kikumura, 918 F.2d 1084, 1108 (3d Cir. 1990), we have found that it"is logical and in conformity with the purposes of the criminal law," United States v. Cruz-Jimenz, 977 F.2d 95, 102 n.10 (3d Cir. 1992), and we have employed its principles on several occasions. See, e.g., id.; Cicco, 10 F.3d at 984-85; Everett, 700 F.2d at 908. Moreover, the majority of federal courts have now embraced the MPC test for attempts as well. See Cruz-Jimenz, 977 F.2d at 102 n.8 (citing cases); Dressler, supra, at S 27.09[A].

require a showing of intent and "evidence of conduct constituting a substantial step toward commission of the crime in pursuit of the culpable intent"); Everett, 700 F.2d at 908 (conviction for attempt requires proof of intent and "some measure of objective evidence corroborating the attempted" crime).

It naturally follows that the government need not prove that an actual trade secret was used during an EEA investigation, because a defendant's culpability for a charge of attempt depends only on "the circumstances as he believes them to be," not as they really are. The government can satisfy its burden under S 1832(a)(4) by proving beyond a reasonable doubt that the defendant sought to acquire information which he or she believed to be a trade secret, regardless of whether the information actually qualified as such. Consequently, in the instant case, the defendants have no arguable constitutional or statutory right to view the unredacted portion of the Taxol documents in order to defend against charges of attempt on the basis of legal impossibility.

2. Conspiracy

We also hold that the defendants have no need for the Taxol documents to defend against the government's charges of conspiracy, because we conclude that legal impossibility is not a defense to conspiracy. Although we have stated that impossibility may be a valid defense to attempt crimes, Berrigan, 482 F.2d at 190, we have never recognized the defense for conspiracy charges, and we are persuaded by the views of our district courts, and by the decisions of our sister circuits, that the impossibility of achieving the goal of a conspiracy is irrelevant to the crime itself. See, e.g., United States v. Wallach, 935 F.2d 445, 470 (2d Cir. 1991); United States v. LaBudda, 882 F.2d 244, 248 (7th Cir. 1989); United States v. Petit, 841 F.2d 1546, 1550 (11th Cir. 1988); United States v. Everett, 692 F.2d 596, 599 (9th Cir. 1982); Yepes v. United States, Civ. A. No. 93-2310, 1993 WL 525578, at *4 (D.N.J. Dec. 15, 1993).

It is well-settled that conspiracy and attempt serve different roles in the criminal law. The law of attempts was

25

traditionally viewed as a way "to deal with conduct which create[d] a risk of immediate harmful consequences." Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law, S 6.5(b), at 91 (2d ed. 1986). Even under the modern view, attempt prosecutions generally proceed only against those who have taken a "substantial step" toward commission of a substantive crime. See Model Penal Code S 5.01(1)(c) (1985). However, the law of conspiracy is much more preventive, aiming to nip criminal conduct in the bud before it has the chance to flourish into more ominous behavior. See Wallach, 935 F.2d at 470 (noting that conspiracy serves to protect society and prevent criminal behavior "in its early stages"); LaFave & Scott, supra, S 6.5(b), at 91 (stating that "[c]ourts have generally taken a broader view of the purposes of conspiracy"). As the Supreme Court has written,

> [t]he law of conspiracy identifies the agreement to engage in a criminal venture as an event of sufficient threat to social order to permit the imposition of criminal sanctions for the agreement alone, plus an overt act in pursuit of it, regardless of whether the crime agreed upon actually is committed. Criminal intent has crystallized, and the likelihood of actual, fulfilled commission warrants preventive action.

United States v. Feola, 420 U.S. 671, 694 (1975) (citations omitted).

It is thus the conspiratorial agreement itself, and not the underlying substantive acts, that forms the basis for conspiracy charges. United States v. Jannotti, 673 F.2d 578, 591 (3d Cir. 1982) (en banc). The "illegality of the agreement does not depend on the achievement of its ends," and it is "irrelevant that the ends of the conspiracy were from the very inception of the agreement objectively unattainable." Id.; see also United States v. Olgin, 745 F.2d 263, 273 (3d Cir. 1984) (stating that "the objective impossibility of attaining the goals of a conspiracy is irrelevant to the guilt of those who conspire"). Consequently, it is equally irrelevant that the commission of a substantive offense may have been legally impossible for the conspiracy to achieve all along. We therefore join our sister circuits, and the district courts in our own

26

circuit, in squarely holding that legal impossibility is not a defense to conspiracy.[20]

As a result, the Taxol trade secrets in the Bristol–Myers documents are not "material" to the preparation of the defendants' impossibility defense, because proof that the defendants sought to steal actual trade secrets is not an element of the crimes of attempt or conspiracy under the EEA. A defendant can be convicted of attempt or conspiracy pursuant to 18 U.S.C. SS 1832(a)(4) or (a)(5) even if his intended acts were legally impossible.

_____

20. We are aware of only three federal appellate decisions even implying that legal impossibility is a defense to conspiracy, but none of these cases is probative of the issue before us. First, in Ventimiglia v. United States, the Fourth Circuit reversed the convictions of three defendants accused of conspiring to violate a Taft–Hartley Act provision forbidding the payment of money by an employer to "any representative of any of his employees." 242 F.2d 620 (4th Cir. 1957). Because the defendants had paid a person who was not, in fact, a "representative of " their employees, the court held that the conviction for conspiracy was legally impossible. However, the defendants in that case knew that the individual in question was not a "representative" within the meaning of the statute. Id. at 266. Therefore, the court's comments regarding legal impossibility were entirely in dicta; the convictions were reversed because the defendants did not even have the specific intent needed to sustain a charge of conspiracy.

Second, in O'Kelley v. United States, the Eighth Circuit held that several defendants could not be convicted of a conspiracy to steal goods in interstate commerce where the goods were not in interstate commerce. 116 F.2d 966, 968 (8th Cir. 1941). However, this statement was also dicta, because there was no jurisdiction to prosecute the defendants absent proof of an effect on interstate commerce, and, as in Ventimiglia, there was no showing that the defendants possessed the requisite criminal intent.

Finally, in Woo Wai v. United States, the Ninth Circuit reversed a conviction for a conspiracy to smuggle aliens into the U.S., because, inter
alia, the act would not have been a crime even if completed. 223 F. 412, 414–15 (9th Cir. 1915). Yet Woo Wai was an entrapment case, and any references to the impossibility of the crime were wholly extraneous to the holding. Moreover, to the extent that Woo Wai states that impossibility is a defense to conspiracy in the Ninth Circuit, the Ninth Circuit has since rejected that claim expressly. See, e.g., Everett, 692 F.2d at 599; United States v. Sanford, 547 F.2d 1085, 1091 (9th Cir. 1976).

27

B. Relevance of Purported Secret Information to
Other Aspects of the Defense Strategy

Having concluded that the defendants' right to access
actual trade secrets is not required in order to defend
against an element of the government's case, the question
remains whether the defendants' right of access to the
information as it relates to other defenses passes muster
under the test of materiality. The defendants argue that the
unredacted documents are also material to the preparation
of the potential defenses of entrapment, outrageous
government conduct, and jurisdiction, and contend that the
documents are needed to defend against the elements of
attempt and conspiracy, the allegations of the indictment,
and the evidence that the government intends to introduce
at trial.

As an initial matter, we note that we are skeptical of the
materiality, let alone relevance, of the redacted trade secret
information to these issues. For example, the defendants
argue that they need the unredacted documents to disprove
the intent and "substantial step" elements of attempt and
the "overt act" requirement of conspiracy.[21] However, proof
of these factors is necessarily independent of any trade
secrets contained in the Bristol-Myers documents, because
the defendants can be guilty of attempt and conspiracy to
steal trade secrets even if the documents contained no
confidential information at all. See MPC S 5.01(1)(c)
(attempt), S 5.02(1)(a) (conspiracy).[22]

_____

21. Conspiracy charges under S 1832 require both an agreement and
an "overt act" in furtherance of the conspiratorial objective. See 18
U.S.C. S 1832(a)(5) (providing that a defendant is guilty of conspiracy if
he "conspires with one or more other persons" to commit an offense
proscribed by S 1832, and if "one or more of such persons do any act to
effect the object of the conspiracy").

22. Moreover, the government has assured us that it has no intention
to use or refer to the alleged trade secrets at trial. The government
intends to prove its allegations instead by using other materials that
reflect an attempt and a conspiracy to violate the EEA. For example, the
government has stated that it may offer the e-mail list that Chou
allegedly sent to Hartmann on March 13, 1997, outlining the "core
technology" that YFP would need to complete a deal. By this list the
government intends to prove that the defendants attempted to steal what
they believed to be "trade secrets" without ever revealing the actual
trade
secrets themselves. The jury will thus never learn-- and will have no
reason to learn -- of the content of the redacted material.

28

However, we will not address defendants' claim of need for the redactions as to any other defense or aspect of the case for two reasons. First, the defendants never raised the materiality of the redacted information as to any other defenses before the district court, and the court never addressed these other arguments in its opinion. The defendants' briefs to the district court argued only that the government must prove the existence of an actual trade secret in a prosecution for attempt and conspiracy and that legal impossibility remains a viable defense. We will not examine other contentions as to the materiality or relevance of trade secret information that are being raised for the first time on appeal. See Harris v. City of Philadelphia, 35 F.3d 840, 845 (3d Cir. 1994) ("This court has consistently held that it will not consider issues that are raised for the first time on appeal.").23

Further, no one -- not this Court, not the district court, not even the parties themselves -- knows the content of the redacted Bristol-Myers documents at issue in this case. It was stated at oral argument that the documents have been reviewed and edited for trade secrets by Bristol-Myers employees alone, without any oversight by the court, the government, or the defense. Thus, while we might be skeptical of the defendants' asserted need for this information, we will not decide whether they have a right to access documents that could conceivably reveal information needed to preserve their rights to a fair trial. Only defense counsel know the precise contours of the defendants' case, and we are not in a position to make judgments about the

_____

23. In some situations, we provide direction to the parties by addressing issues that are certain to arise upon a remand of the case, even if the issues were not discussed initially by the district court. See, e.g., New Jersey Coalition of Rooming and Boarding House Owners v. Mayor of Asbury Park, ___ F.3d ___, No. 97-5483, 1998 WL 427231, at *2 (3d Cir. July 30, 1998) (highlighting statutory and constitutional claims "that may require further consideration" upon remand). Here, however, we are unable to offer informed guidance, because we are without the benefit of a full review of the redacted materials. The complete breadth of the defendants' arguments cannot be determined unless and until this case is remanded and the district court examines the potential defenses in light of the content of the Bristol-Myers documents.

impact of the redacted material without having seen the material ourselves.

Accordingly, we will remand this action to the district court. If the defendants raise before the district court the additional arguments that they have urged on appeal, we would expect the district court to conduct an in camera review to determine whether the documents have been properly redacted to exclude only confidential information and to assess whether what was redacted is "material" to the defense.

In such event, because "public policy requires protection of portions of a document, . . . in camera inspection by the trial judge or magistrate is unavoidable." Bogosian v. Gulf Oil Corp., 738 F.2d 587, 596 (3d Cir. 1984). Even if proof of an actual trade secret is not an element of SS 1832(a)(4) and (a)(5), an independent assessment of whether materials are nonetheless discoverable is anticipated in the language of S 1835, which provides that the district court "shall enter such orders and take such other action as may be necessary and appropriate to preserve the confidentiality of trade secrets, consistent with the requirements of the Federal Rules of Criminal and Civil Procedure, the Federal Rules of Evidence, and all other applicable laws." Rule 16(a)(1)(C) of the Federal Rules of Criminal Procedure enables the defendants to obtain documents in the government's possession that are material to the preparation of their defense, or are intended for use by the government as evidence in chief at trial. These principles suggest that the district court should examine the relevant portions of the Bristol–Myers documents to assess the materiality of those portions of the documents sought to be withheld. See United States v. Bocra, 623 F.2d 281, 285 (3d Cir. 1980) ("The submission of discovery materials to the court for an in camera inspection and decision as to which materials are discoverable is commonly used when the Government's need for preserving confidentiality over the materials must be balanced with the defendant's constitutional right to evidence material to his defense."). We leave to the district court the ultimate resolution of these issues if raised on remand by the defendants.

IV. CONCLUSION

The district court's Order dated October 27, 1997, will be reversed, and the cause will be remanded for further proceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit